**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DANIEL LARSEN,
   *Petitioner-Appellee*,

v.

JOHN SOTO,
   *Respondent-Appellant*.

No. 10-56118

D.C. No.
2:08-cv-04610-CAS-SS

ORDER AND
AMENDED OPINION

Appeal from the United States District Court
for the Central District of California
Christina A. Snyder, District Judge, Presiding

Argued and Submitted
July 30, 2013—Pasadena, California

Filed September 16, 2013
Amended November 20, 2013

Before: William C. Canby, Jr., Stephen Reinhardt,
and Kim McLane Wardlaw, Circuit Judges.

Order;
Opinion by Judge Wardlaw

## SUMMARY[*]

### Habeas Corpus

The panel affirmed the district court's denial of a warden's motion to dismiss a facially untimely 28 U.S.C. § 2254 habeas corpus petition based on a showing of actual innocence.

After concluding that remand for consideration of the Supreme Court's recent decision in *McQuiggin v. Perkins*, 133 S. Ct. 1924 (2013), was unnecessary because the district court already undertook the analysis that *Perkins* prescribes, and after rejecting the warden's arguments regarding the credibility of petitioner's evidence, the panel held that petitioner satisfied the demanding standard of producing proof of innocence sufficient to undermine a court's confidence in his conviction.

### COUNSEL

Stephanie C. Brenan (argued), Deputy Attorney General; Xiomara Costello, Supervising Deputy Attorney General; Dane R. Gillette, Chief Assistant Attorney General; Kamala D. Harris, Attorney General; Michael R. Johnsen, Supervising Deputy Attorney General; Richard S. Moskowitz, Deputy Attorney General; and Lance E. Winters, Senior Assistant Attorney General, Los Angeles, California, for Respondent-Appellant.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Jan Stiglitz (argued), Alissa Bjerkhoel, Justin Brooks, and Alexander Simpson, California Innocence Project, San Diego, California, for Petitioner-Appellee.

Benjamin G. Damstedt and Lori R. Mason, Cooley LLP, Palo Alto, California; Scott A. Cole, Cooley LLP, Reston, Virginia, for Amicus Curiae.

**ORDER**

The opinion filed September 16, 2013, is hereby AMENDED as follows:

1. At page 9, line 9, of the slip opinion, delete <also submitted> and replace it with <had also attached to his federal habeas petition>.

2. At page 19, lines 9–10, of the slip opinion, delete <and that the civil attorney helped> and replace it with <and that the civil attorney, Bradley Gage, helped>.

3. At page 19, line 20, of the slip opinion, delete <against the State, and then abandoned him> and replace it with <against the State.  Linder and Gage then abandoned Larsen>.

4. At page 19, line 24, of the slip opinion, delete <extremely>.

5. At page 19, lines 26–27, of the slip opinion, delete <because of his retention of Linder> and replace it with <based on his retention of Gage and Linder>.

With the opinion thus amended, the panel has unanimously voted to deny the petition for rehearing. Judges Reinhardt and Wardlaw have voted to deny the suggestion for rehearing en banc, and Judge Canby has recommended denial.

The full court has been advised of the petition for rehearing en banc. No active judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for rehearing and suggestion for rehearing en banc are **DENIED**. No future petitions for rehearing or petitions for rehearing en banc will be entertained.

**OPINION**

WARDLAW, Circuit Judge:

Warden John Soto appeals the denial of his motion to dismiss Daniel Larsen's petition for a writ of habeas corpus. The district court held that Larsen's claims could be considered on the merits despite the facial untimeliness of his petition, on the ground that Larsen presented compelling evidence that he is actually innocent. Notwithstanding the one-year limitations period imposed on the filing of federal habeas petitions by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), *see* 28 U.S.C. § 2244(d), a habeas petitioner who convincingly demonstrates that he is innocent is entitled to present his claims for relief in federal court. *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928 (2013). We conclude that Larsen has made the requisite showing of innocence, and we affirm.

## I.

## A.

On the night of June 6, 1998, Los Angeles police responded to a report of an assault with a deadly weapon with shots fired at the Gold Apple bar[1] in Los Angeles's San Fernando Valley. The suspect was identified as a man wearing a green flannel shirt and his hair in a ponytail. LAPD Officers Michael Rex and Thomas Townsend responded to the scene. According to the officers, they approached the bar with their headlights and sirens turned off to avoid alerting any possible suspects of their arrival. They approached the bar through a back driveway and turned on overhead floodlamps, side spotlights, and high beams.

Officer Townsend would later testify (at Larsen's 1999 trial) that he and Officer Rex quickly noticed a man in the bar's parking lot who matched the earlier description of the suspect. Both officers would testify that the man pulled a linear object, about five or six inches long, from his waistband and threw it underneath a nearby car, and that this man, who wore a green flannel shirt, was Daniel Larsen.

That night, after seeing the man in the parking lot, the officers ordered everyone in the parking lot to get down on their knees with their hands on their heads and detained a number of them in handcuffs. They placed Larsen in the back of a police car, and Officer Townsend then set out to search for the object that he testified Larsen had thrown. Officer

---

[1] Various parts of the record refer to both the "Gold Apple" and "Golden Apple." We use the former appellation throughout this opinion for consistency.

Townsend found a double-edged knife with a weighted handle and a finger guard underneath a pickup truck. He also found a copper cylinder ten to thirty feet from where Larsen had been standing, but in the opposite direction from where he said he had seen Larsen throw the object. Officer Rex also testified that the object Larsen threw was noticeably bigger than the copper bar. Larsen was arrested at the scene. When Rex asked for his name, Larsen falsely replied that his name was "Anthony Vant."

Larsen was charged with possession of a deadly weapon under former California Penal Code § 12020(a) and convicted after a jury trial.[2] The prosecution chose to charge the offense as a felony. Because Larsen had several prior felony convictions, he was sentenced to twenty-eight years to life imprisonment under California's Three Strikes Law. The California Court of Appeal affirmed Larsen's conviction on direct review on June 1, 2000, and the California Supreme Court denied review on August 9, 2000.

**B.**

In May 2005, Larsen filed a habeas petition in Los Angeles County Superior Court. He argued that he had received ineffective assistance of counsel at his trial because his defense attorney, who has since been disbarred, failed to

---

[2] California's Deadly Weapons Recodification Act of 2010 recodified the penal statutes relating to the control of deadly weapons without substantive change. *See* Cal. Penal Code § 16005. The specific provision under which Larsen was charged is now codified at California Penal Code § 21310, which provides that "any person in this state who carries concealed upon the person any dirk or dagger is punishable by imprisonment in a county jail not exceeding one year or imprisonment pursuant to subdivision (h) of Section 1170."

conduct an adequate investigation of his case, did not call several potentially exculpatory witnesses, failed to request that the knife be examined for fingerprints, and did not present a theory of third-party culpability.

Larsen attached thirteen exhibits to his petition, including several declarations from individuals who witnessed the events at the bar who declared that Larsen was not the individual who threw the knife. For example, Larsen submitted a declaration from James McNutt, a retired Army Sergeant First Class and former police chief. Mr. McNutt declared that he was in the parking lot of the bar with his wife on the night in question. There, he saw "a man nicknamed 'Bunker'" arguing with Mr. McNutt's stepson, Daniel Harrison. When the police began to arrive, Mr. McNutt "saw Bunker reach into the waistband of his pants. He took something out that looked like a knife. He threw it under a car that was parked to the left of my son's car." Mr. McNutt saw another man, who he later learned was Larsen, being detained and "wondered why he had been arrested." Mr. McNutt's wife, Elinore, who accompanied him that night, also declared that she "observed Bunker reach into the waistband of his pants and remove and throw a shiny object. He threw it under a car that was parked to the left of my son's car." She specifically declared that "Daniel Larsen had nothing in his hands, nor had he made any movements at this time." Both McNutts stated that they did not believe Larsen did anything on the night in question that warranted his arrest. They had moved to North Carolina and did not know that Larsen had been tried or convicted for any crime.

Larsen submitted another declaration from Jorji Owen, the girlfriend of a man named William Hewitt, also known as "Bunker." She declared that after the incident at the Gold

Apple bar, "Hewitt told me that Larsen had been arrested for possession of his (Hewitt's) knife, and that he (Hewitt) had tossed the knife under a truck when the police arrived at the bar." According to Owen, Hewitt sold his motorcycle to bail Larsen out of jail "because the knife belonged to him, he was the individual who had thrown the knife when the police arrived, and he felt responsible for Larsen being in jail." Larsen also submitted a declaration from Hewitt himself, which stated: "I know that the knife was not [Larsen's], because it was mine." Hewitt stated that he "did not testify in the trial in which Daniel Larsen was convicted, because no one subpoenaed me."

Larsen raised similar claims in habeas petitions before the California Court of Appeal in March 2006 and before the California Supreme Court in May 2006. All three courts denied relief.

## C.

Larsen filed his federal habeas petition on July 15, 2008, and filed the operative First Amended Petition on October 27, 2008. His sole claim for relief is that his trial counsel was unconstitutionally ineffective because he failed to locate, investigate, and present exculpatory witnesses or to present a third-party culpability theory to the jury.

AEDPA generally imposes a one-year period of limitations on a federal habeas petition, commencing on the date when the challenged conviction becomes final. 28 U.S.C. § 2244(d)(1)(A). It is undisputed that Larsen's federal petition was filed in 2008, well over a year after his 1999 conviction became final. *See Bowen v. Roe*, 188 F.3d 1157, 1159 (9th Cir. 1999) (noting that a state court criminal

judgment is "final" for purposes of collateral attack at the conclusion of review in the United States Supreme Court or when the time for seeking certiorari review expires). Although the one-year limitation period is tolled during the pendency of a proper state habeas petition, *see* 28 U.S.C. § 2244(d)(2), Larsen did not file his state petition until May 18, 2005. We have held "that section 2244(d) does not permit the reinitiation of the limitations period that has ended before the state petition was filed." *Ferguson v. Palmateer*, 321 F.3d 820, 823 (9th Cir. 2003). Thus, it is clear that Larsen's petition is facially untimely under § 2244(d).

However, the Supreme Court has long recognized that in a "narrow class of cases . . . implicating a fundamental miscarriage of justice," *Schlup v. Delo*, 513 U.S. 298, 314–15 (1995) (quoting *McCleskey v. Zant*, 499 U.S. 467, 494 (1991)), federal courts may hear the merits of a habeas petition despite an otherwise applicable procedural bar. Larsen contends, and the district court concluded, that his ineffective-assistance-of-counsel claim should be considered on the merits despite its untimeliness because he is innocent. "[P]risoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *House v. Bell*, 547 U.S. 518, 536–37 (2006) (quoting *Schlup*, 513 U.S. at 327). If Larsen satisfies this demanding standard, then he is entitled to have his federal claim heard on the merits notwithstanding the statute of limitations prescribed by § 2244(d). *Perkins*, 133 S. Ct. at 1932.[3]

---

[3] The Warden initially argued that the innocence exception recognized in *Schlup* was not available to excuse the untimeliness of a federal habeas petition under § 2244(d). However, in *Perkins* the Supreme Court held,

**D.**

Magistrate Judge Suzanne H. Segal held two evidentiary hearings related to Larsen's petition, on May 19 and November 17, 2009. The first hearing concerned the State's motion to dismiss the petition, and thus focused solely on whether Larsen could make the showing of factual innocence required to excuse the time bar to consideration of the merits of his petition. Larsen called three witnesses at the evidentiary hearing: James McNutt, Elinor McNutt, and Brian McCracken. He had also attached to his federal habeas petition declarations from Jorji Owen and William Hewitt that he had submitted with his state habeas petition. *See supra* p. 7.

James McNutt testified that he is a 22-year veteran of the military and a former police officer. At the time of the hearing, he was a correctional officer in Tennessee. He testified that he was present in the parking lot of the Gold Apple on the night Larsen was arrested. He and his wife were meeting his stepson, Danny; he estimated they arrived at 7:30, though he was "not positive of the time." After his wife heard "a loud noise down where Danny's car was parked, some arguing going on," Mr. McNutt went to investigate the situation. Danny was arguing with a man whom he repeatedly referred to as "Bunker," and Bunker was

---

as we had previously concluded in *Lee v. Lampert*, 653 F.3d 929, 932 (9th Cir. 2011) (en banc), that *Schlup*'s innocence exception to ordinary rules of procedural default is applicable "when the impediment is AEDPA's statute of limitations." 133 S. Ct. at 1932. Thus, the Warden's argument that no such exception to the statute of limitations exists is foreclosed.

"doing all the talking." Larsen was also present, but was not participating in the argument.

Within about two minutes, Mr. McNutt observed "approximately 20, 25 LAPD that were coming from all different directions." McNutt saw Bunker throw a metallic object underneath a nearby vehicle; he stated that "from [his] professional experience" the object likely was not a gun, and he assumed it was a knife based on "the way it sounded underneath the vehicle." In contrast to Bunker, Larsen "didn't say one word . . . . His hands were at the side the whole time, and he was just standing there, listening." Subsequently, a police officer handcuffed and frisked McNutt, "massaging" his penis for about five or six seconds in the process. When the officers realized that McNutt was affiliated with law enforcement, they released him.

Mr. McNutt witnessed Larsen's arrest. However, it was not until two and a half years later[4] that an attorney contacted him about providing testimony on Larsen's behalf. Mr. McNutt would have testified on Larsen's behalf, but the attorney never provided a specific time or place to go to give his testimony. If he had been called to testify at Larsen's trial, his testimony would have been consistent with his statements at the evidentiary hearing.

On cross-examination, Mr. McNutt testified that he did not notice any flood lights or hear a helicopter during the

---

[4] The record reflects that around this time, Larsen was attempting to obtain representation to challenge his conviction. Though he had some false starts with various attorneys who it appeared might take his case, it was not until after the California Innocence Project began representing Larsen in 2002 that he pursued habeas relief.

events in the parking lot.  He never actually made it into the bar that night, and all the events he witnessed occurred around 7:30 p.m., though he was "not sure of the exact time." When asked, he specifically stated that a copper weight would not have made the sound he heard when Bunker threw the object.  He also stated that he "was a nervous wreck, all these police officers and shotguns and everything," and that he felt the officers were rude and rough.

Elinore McNutt began her testimony by recounting that she had had several back surgeries and suffered from neuropathy, diabetes, and fibromyalgia; she indicated that these conditions would make it difficult for her to sit for a long period of time.  She went with her husband to the Gold Apple bar on the night in question to meet her son, but she could not remember what time they went.  She "saw a couple of guys walking right up to [her] son's car, kind of in a hurry," and she recognized one of them as a man known by the nickname Bunker.  Larsen was also present.  Because it appeared that "something [was] going on," her husband walked over to where the confrontation was taking place while Mrs. McNutt waited at the tailgate of her truck.  Bunker exchanged words with her son while Larsen stood by silently. Within three or four minutes, the police arrived.  When the police began to approach, Bunker "reached in his pants pocket or shirt and tossed a knife under [a] car"[5] near where he was standing.  Meanwhile, Larsen "just stood there, kind of, dumbfounded.  Then turned and walked away."  She testified that she could see him well and that she did not see anything in his hands.

---

[5] Mrs. McNutt then corrected herself, stating: "I don't know if it was a knife.  I'm just hearing something hit through – a metal, clank, skidding, you know, noise, but I don't know what it was."

Although she saw Larsen being placed in a patrol car, Mrs. McNutt did not make inquiries because the officers were busy and "were telling people to leave." Had she known that the officers were arresting Larsen for throwing the object under the car, she would have corrected their mistake. However, the officers did not take a statement from her. She would have been willing to testify in Larsen's defense at trial had she been asked to do so.

On cross-examination, Mrs. McNutt clarified that it was just beginning to get dark when she arrived at the bar; because it was June, she estimated that would have been around 8:00. She thought that they had gone into the bar for one or two drinks after the police left, though she "[couldn't] be positive that far, long ago"; in any event, she did not "think [they] were there a long time, because [her] husband was, pretty, you know, upset." She recalled the parking lot being lit by street lights, but did not recall any flood lights from police cars or the presence of any helicopters. She also saw that her husband was "fondled" by a police officer, and could not believe what was happening. She stated that an officer grabbed her by the hair, but she did not complain through any official channels because "it doesn't do a lot of good to call LAPD, from what I heard." She also testified that her eyes were not on Bunker or Larsen for the entire incident, because she "scanned" the area to see everything that was going on.

Finally, Larsen called Brian McCracken to testify. McCracken began by revealing that he was convicted of conspiracy in 1990 and then in 1998 for being a felon in possession of a firearm. He has not been arrested since 2001, and at the time of the hearing was employed making aircraft components. McCracken was alone at the Gold Apple bar on

the night in question. He knows Daniel Larsen, who was also at the bar that night. He recounted that a man other than Larsen approached him in the bar; they exchanged words, and the man "flashed a knife." The man said, "You know, I could kill you right now." McCracken described the knife as double-edged and about four to five inches long. It had "something that could have come over your thumb and index finger"–"a hand protector." He was then shown a photograph of a knife that was found in Larsen's trial counsel's file, and testified that it "looks pretty similar" to the knife he saw at the bar. He never saw Daniel Larsen with a knife that evening. Though McCracken and the man with the knife resolved their dispute without an altercation, the bartender informed McCracken that she had called the police. He was not in the parking lot when Larsen was arrested. McCracken testified that Larsen later called him from jail, and he told Larsen, "I know you didn't have the knife that night. Have your lawyer get a hold of me."

On cross-examination, when asked what the man with the knife looked like, McCracken stated that he was short with brown hair and a medium build. After McCracken stated that he could not remember certain details about the man's appearance because ten years had elapsed, he was asked whether "it would be hard to also remember what the knife looked like"; he responded, "No, I remember the blade distinctly because when somebody says, you know: I could kill you right now, and then they show you something, that one particular moment just stuck in my mind." He had known Larsen for about fifteen years, but they were not close friends. Larsen presumably called him from jail only because Larsen was aware that McCracken would have known that Larsen did not have the knife on the night of the arrest. He admitted that he had not seen anyone in the parking lot throw

an object and was not present when the police arrived. McCracken thought he may have had one beer before seeing the knife, and had drunk one or two beers total that night. He waited to leave the bar until he was certain the police had left, and ultimately left around 9:30.

Based on the evidence before her, Magistrate Judge Segal recommended that the district court deny the Warden's motion to dismiss Larsen's habeas petition as untimely. She concluded that, in light of the evidence Larsen presented, "no reasonable juror would have found Petitioner guilty beyond a reasonable doubt." The district court adopted that recommendation.

Magistrate Judge Segal then held a second evidentiary hearing on Larsen's ineffective assistance of counsel claim. Finding that Larsen "clearly received ineffective assistance of counsel" because his trial counsel failed to present any evidence in Larsen's defense, she recommended that the district court grant the First Amended Petition and order the Warden to release Larsen or retry him within ninety days. Over the State's objections, the district court granted the First Amended Petition, remanding Larsen's case for a new trial in state court within ninety days, unless the state decided not to retry him. The Warden appealed.

## II.

We review de novo the district court's decision to grant or deny a petition for a writ of habeas corpus. *Lambert v. Blodgett*, 393 F.3d 943, 964 (9th Cir. 2004). "Factual findings and credibility determinations made by the district

court in the context of granting or denying the petition are reviewed for clear error." *Id.*[6]

The Warden does not appeal the district court's grant of relief on the merits of Larsen's ineffective assistance claim. Nor does he pursue a claim that the evidentiary hearings held before Magistrate Judge Segal were improper under *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011). The Warden has therefore waived those issues. *See Trest v. Cain*, 522 U.S. 87, 89 (1997) (observing that a State can waive non-jurisdictional defenses in habeas proceedings). Thus, the only issue before us is whether the district court properly denied the Warden's motion to dismiss Larsen's petition as beyond AEDPA's limitation period.

## III.

## A.

As an initial matter, we must determine the effect, if any, of the Supreme Court's recent decision in *Perkins* on Larsen's appeal. The Court held that "actual innocence, if proved, serves as a gateway through which a petitioner may

---

[6] We reject the Warden's suggestion that we should somehow review the district court's credibility determinations de novo. While it is true that the question whether Larsen has satisfied the *Schlup* standard is a legal question that we review de novo, that is a distinct inquiry from the question whether the witnesses testified credibly to facts within their knowledge. The district court is entitled to deference on the latter point. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985). The district court determined "that the McNutts were credible and persuasive witnesses" and that "McCracken also gave credible testimony." The Warden provides no reason to conclude that these determinations were clearly erroneous, and thus we leave them undisturbed.

pass" to present otherwise time-barred claims in federal court. 133 S. Ct. at 1928. The Court also "clarifie[d] that a federal habeas court, faced with an actual-innocence gateway claim, should count unjustifiable delay on a habeas petitioner's part, not as an absolute barrier to relief, but as a factor in determining whether actual innocence has been reliably shown." *Id.* Seizing on this language, the Warden urges us to remand to the district court for reconsideration of Larsen's claim in light of *Perkins*. He argues that, because it did not have the benefit of the Court's ruling at the time it considered Larsen's petition, the district court ran afoul of *Perkins* by considering Larsen's diligence "discretely" and not as a factor going to the credibility of his new evidence. *Cf. id.* at 1936.

We are not persuaded that remand is necessary. Were the district court's reasoning tainted by legal error that prevented it from properly analyzing the question before it, remand would be proper. *See Johnson v. Bay Area Rapid Transit Dist.*, — F.3d —, 2013 WL 3888840 at *10 (9th Cir. July 30, 2013). But that is not the case here. Rather, the Report and Recommendation approved by the district court expressly analyzed whether Larsen's delay in filing his federal habeas petition undermined the credibility of his new evidence, and concluded that it did not. The Magistrate Judge rejected the Warden's argument that Larsen's actual innocence claim was not credible because "no petitioner who is actually innocent would choose to remain silent about his federal habeas claims for more than a year." Even without the benefit of *Perkins*, the Magistrate Judge recognized that a belated assertion of innocence, coupled with new evidence, could undermine an actual innocence claim. However, she rejected that argument in Larsen's case because he "did not remain silent about his innocence." The Magistrate Judge found:

At trial, [Larsen] pled not guilty.  In his declaration in support of his Petition, [Larsen] stated that he asked his trial attorney to present exculpatory evidence from Hewitt, Owen, and others.  When [Larsen] became aware of the McNutts' exculpatory testimony, he asked his trial attorney to move for a new trial and unequivocally stated, "I'm innocent."

[Larsen] continued to assert his innocence after his conviction.  Between his conviction in 1999 and the start of the California Innocence Project's representation in 2002, [Larsen] contacted nine different attorneys or legal organizations for assistance in proving his innocence.

The Magistrate Judge also evaluated the witness testimony supporting Larsen's evidence and found it credible:

Not only has [Larsen] consistently proclaimed his own innocence, but Petitioner's supporting witnesses have as well.  The McNutts, who appear to have no other connection with [Larsen], have testified credibly to [Larsen]'s innocence for approximately eight years.  In statements made informally, under oath in a declaration, and under oath in live testimony before the Court, the McNutts have maintained a consistent version of events.

The district court considered this reasoning and adopted the Magistrate Judge's conclusion that:

> This appears to be one of the "*extraordinary*
> cases where the petitioner asserts his
> innocence and establishes that the court
> cannot have confidence in the contrary finding
> of guilt." *Johnson[ v. Knowles]*, 541 F.3d
> [933,] 937 [(9th Cir. 2008)].

Contrary to the Warden's argument, the analysis in the
Report and Recommendation demonstrates that diligence was
not considered "only discretely." The Magistrate Judge made
findings upon which she and the district court concluded that
Larsen's delay in filing did not show that his evidence was
unreliable, but was rather explained by his defense attorney's
failures and his subsequent attempts to acquire appropriate
legal representation. The Magistrate Judge then concluded
that Larsen's evidence was reliable because it has remained
substantively consistent for over a decade. This is perfectly
consistent with the Court's teaching in *Perkins* that
"*[u]nexplained* delay in presenting new evidence bears on the
determination whether the petitioner has made the requisite
showing." 133 S. Ct. at 1935 (emphasis added). In short, it
is simply implausible that *Perkins* would alter the district
court's conclusions about the credibility of Larsen's evidence,
because the district court already undertook the precise
analysis that *Perkins* prescribes.

## B.

Alternatively, the Warden urges us to independently
conclude, on the basis of *Perkins*, that Larsen's delay in filing
a federal habeas petition diminishes the credibility of his
"new" evidence. He contends that Larsen has failed to
explain why he delayed from his conviction in 1999 until his

first state habeas petition in 2005 to present his new evidence. We disagree.

First, the evidence is not really new. As discussed *supra*, Larsen's federal habeas petition was the culmination of his unbroken efforts over many years to prove his innocence using evidence he knew could exonerate him but which his attorney incompetently failed to present at trial. Second, the Warden stretches the record by claiming that, by 1999 or 2000, Larsen had all the information he needed (and all the legal assistance required) to collaterally attack his conviction on the basis of actual innocence. The Warden notes that Larsen averred in a declaration submitted to the California Supreme Court that he was aware of the McNutts "after [his] conviction but before [he] was sentenced." He also points out that in his First Amended Petition in federal court, Larsen stated that the McNutts gave a written statement to Larsen's girlfriend "dated September 21, 2001." Further, the Warden notes that Larsen declared before the California Supreme Court that he "had engaged a civil attorney . . . to help [him] prove [his] innocence" as of September 2000, and that the civil attorney, Bradley Gage, helped him find another attorney named Charles Linder to "write [his] habeas petition." Given Larsen's awareness of exculpatory witnesses and the fact that he had the assistance of counsel during the relevant period, the Warden contends that Larsen should have presented his evidence of innocence earlier than 2005 and has not explained his failure to do so.

This argument is unavailing. First, as the Warden acknowledges, Linder only agreed to prepare Larsen's habeas petition "in exchange for five percent of the proceeds of [his] civil case" against the State. Linder and Gage then abandoned Larsen after "a California Supreme Court case

came down that made it impossible for us to win a civil suit until after [Larsen's] innocence was proven in an evidentiary hearing." Thus, it is misleading for the Warden to suggest the record shows Larsen "had counsel helping him to prove his innocence as early as 2000" based on his retention of Gage and Linder. Second, as the Magistrate Judge found, Larsen contacted numerous legal organizations between 1999 and the start of the California Innocence Project's representation in 2002. That it took Larsen several years to find attorneys to properly develop and present his claims does not undermine the credibility of his evidence.

Next, the Warden argues that Larsen has not explained why it took the California Innocence Project three years from 2002 (when it began representing him) until 2005 to file his habeas petition. The Warden suggests that Larsen's "timing is all the more suspect because he waited to present his evidence of a third-party perpetrator . . . until after the statute of limitations expired for prosecuting that person for carrying a concealed weapon." These arguments are likewise unpersuasive. First, it is inexplicable that Larsen would have willingly allowed the limitations period on his own habeas petition to expire while he remained incarcerated in order to spare William Hewitt from charges of carrying a concealed weapon, and the Warden does not even attempt to offer an explanation. When Larsen filed his state petition in 2005, *Lee* and *Perkins* had not been decided, so a choice to delay filing the petition carried the strong likelihood that federal law could have developed to bar untimely filings notwithstanding a credible claim of actual innocence. Furthermore, three years to locate witnesses scattered across the country, gather declarations, and file Larsen's petition is not so lengthy a time as to be unreasonable. Certainly, that his attorneys were thorough in preparing his petition does not undermine the

reliability of Larsen's evidence. And at any rate, the Warden has not explained why the California Innocence Project would choose to become complicit in Larsen's supposed scheme to spare Hewitt from prosecution by delaying in filing the petition.

Most importantly, the Warden has not explained how any delay in filing by Larsen has prejudiced the State or benefitted Larsen. In fact, as Larsen's counsel pointed out at oral argument, even the Warden's own argument suggests that Larsen is in fact innocent: if Larsen delayed filing his petition to protect Hewitt, then Hewitt (and not Larsen) must in fact be the guilty party. None of the Warden's arguments in any way diminish the credibility of Larsen's evidence. For example, the Warden has not argued that any prosecution witnesses who testified at Larsen's trial have since died or become unavailable. *Cf. Perkins*, 133 S. Ct. at 1936. In essence, the Warden's position amounts to an argument that delay is a *per se* indication that Larsen's evidence is not credible. That is a close cousin of the argument the State of Michigan advanced in *Perkins* that petitioners claiming actual innocence should be subjected to a "threshold diligence requirement"—an argument the Supreme Court concluded "makes scant sense." *Id*. at 1935.

In short, delay is relevant if it is "[u]nexplained" or "unjustified," *id.*, and if it "bear[s] on the probable reliability of [the petitioner's] evidence," *Schlup*, 513 U.S. at 332. Larsen's alleged "delay" is explained and readily understandable, and the Warden presents no plausible reason why his late filing detracts from the credibility of his witnesses, who have never deviated from their description of events on June 6 at the Gold Apple bar. The Magistrate Judge who oversaw the evidentiary hearings in the district

court concluded just the opposite, finding that Larsen's consistent and dogged attempts to prove his innocence and the consistency of his witnesses' testimony over a period of years bolstered the reliability of his innocence claim. These findings are not clearly erroneous, and nothing in *Perkins* points to a different conclusion. We thus turn to the question whether Larsen's new evidence of innocence is enough to permit consideration of his federal claim on the merits.

## IV.

### A.

To present otherwise time-barred claims in federal court, a petitioner must produce proof of his innocence that is sufficient to convince a federal court that a failure to entertain his claim would constitute a fundamental miscarriage of justice. *Lee*, 653 F.3d at 937–38. This "fundamental miscarriage of justice" doctrine has been described as "a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Herrera v. Collins*, 506 U.S. 390, 404 (1993).

"To pass through the *Schlup* gateway, a 'petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.'" *Lee*, 653 F.3d at 938 (quoting *Schlup*, 513 U.S. at 327). "This exacting standard 'permits review only in the 'extraordinary' case,' but it 'does not require absolute certainty about the petitioner's guilt or innocence.' *Id.* (quoting *House*, 547 U.S. at 538). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical

physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. We have held that "where post-conviction evidence casts doubt on the conviction by undercutting the reliability of the proof of guilt, but not by affirmatively proving innocence, that can be enough to pass through the *Schlup* gateway to allow consideration of otherwise barred claims." *Sistrunk v. Armenakis*, 292 F.3d 669, 673 (9th Cir. 2002) (en banc) (citing *Carriger v. Stewart*, 132 F.3d 463, 478–79 (9th Cir. 1997) (en banc)).

The *Schlup* standard "is demanding," *Perkins*, 133 S. Ct. at 1936, and precedents holding that a habeas petitioner satisfied its strictures have typically involved dramatic new evidence of innocence. In *House*, for instance, DNA evidence established that semen found on a murder victim came from the victim's husband and not from House, *see* 547 U.S. at 540–41, and there was evidence that the husband had a history of violence toward his wife, raising an inference that he "could have been the murderer," *id.* at 548. In *Carriger*, the prosecution's chief trial witness had confessed in open court that he himself (and not Carriger) had committed the murder for which Carriger had been convicted. *See* 132 F.3d at 471–72. In contrast, we have denied access to the *Schlup* gateway where a petitioner's evidence of innocence was merely cumulative or speculative or was insufficient to overcome otherwise convincing proof of guilt. *See*, *e.g.*, *Lee*, 653 F.3d at 943–46; *Sistrunk*, 292 F.3d at 675–77. Thus, to satisfy *Schlup*, the petitioner's new evidence must convincingly undermine the State's case. However, definitive, affirmative proof of innocence is not strictly required. As we explained in *Carriger*, a *Schlup* claim "is procedural, not substantive": a petitioner's new evidence must be sufficient to undermine a court's confidence

in his conviction, but not to erase any possibility of guilt. 132 F.3d at 478.

## B.

Larsen has satisfied this demanding standard. None of the Warden's arguments can overcome the simple, crucial fact that Larsen produced witnesses who were never called to speak on his behalf at his trial and who gave credible testimony that someone other than Larsen committed the acts for which he was convicted and sentenced, while Larsen stood nearby and did nothing at all, much less a criminal act. Larsen's claim of innocence lies at the core of the "miscarriage of justice" doctrine: it generates "sufficient doubt about the validity of his conviction to satisfy *Schlup* and permit consideration of his constitutional claims." *Id.* We conclude that it is more likely than not that no reasonable juror hearing all of the evidence Larsen presented in federal court would vote to convict him under the beyond-a-reasonable-doubt standard.

The Warden fails to offer *any* contradictory *evidence*. He merely offers several different arguments in a weak attempt to show that Larsen has not met his burden. First, he claims that the Magistrate Judge misapplied the applicable legal standards by resting her recommendation on her own subjective lack of confidence in the verdict, rather than an objective determination of what a reasonable jury would do given the newly supplanted record. In *Schlup*, the Supreme Court observed that "[i]t is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do."

513 U.S. at 329. However, the Magistrate Judge made an objective determination when she concluded that, "had the jury been able to consider" the evidence presented at the evidentiary hearing, "'no reasonable juror would have found Petitioner guilty beyond a reasonable doubt."

That the Magistrate Judge also referenced her own lack of confidence in the verdict does not render her analysis legally erroneous. Indeed, this same language has been employed both by the Supreme Court and by us in describing the *Schlup* standard. *See*, *e.g.*, *Schlup*, 513 U.S. at 316 ("However, if a petitioner such as Schlup presents evidence of innocence *so strong that a court cannot have confidence in the outcome of the trial* unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims." (emphasis added)); *accord Majoy v. Roe*, 296 F.3d 770, 775–76 (9th Cir. 2002). This "confidence in the outcome" formulation is simply another way of describing *Schlup*'s "no reasonable juror" standard, and one that courts have used for decades. Certainly, it was not reversible error for the district court to employ language that has been endorsed both by the Supreme Court and by our court.

Next, the Warden argues that Larsen has failed to satisfy *Schlup* because nothing in the evidentiary hearing testimony is incompatible with his conviction. This argument by the Warden appears to have evolved over the life of his appeal. In his opening brief, the Warden argued that the McNutts may have been relating a completely separate incident from that discussed by the police officers in their trial testimony. For instance, while the McNutts testified that the events they witnessed occurred around 7:30 or 8:00 p.m., Officer Rex

testified at trial that Larsen was arrested at 12:30 a.m. The Warden contends that it "strains credulity" to think that a middle-aged couple would meet their adult son at a bar that late at night. Coupled with the fact that the McNutts did not recall seeing flood lights or helicopters, the Warden contends, the McNutts' testimony about the time suggests that they may not have been present at all for the events in question.

It is the Warden's argument here that "strains credulity." Both McNutts testified that while they were at the Gold Apple bar, they witnessed an altercation in the parking lot, that numerous police officers thereafter arrived on the scene, that someone threw a metallic object under a nearby car, and that Daniel Larsen was placed in the back of a patrol car. For the McNutts to have witnessed a separate incident, all of these occurrences would have had to repeat themselves within a period of a few hours at the same exact location; indeed, this version of events would require Larsen to have been arrested twice on the same day at the same bar. It is far more likely that the McNutts witnessed the same incident discussed at Larsen's trial. Both McNutts expressed uncertainty about the time of night in their testimony, and did not purport to be definitive about the time of the incident. Similarly, they stated that they did not recall hearing helicopters or seeing floodlights, but as the Magistrate Judge noted, that "[t]he McNutts, eleven years later, did not remember what lights they saw or what sirens they heard" constituted "minor discrepancies that do not cast doubt on the McNutts' clear and consistent memories of seeing Bunker, not Petitioner, throw the object."

In his post-*Perkins* supplemental brief, the Warden argued that the evidentiary hearing testimony is not inconsistent with Larsen's conviction because none of his witnesses actually

testified that they saw Hewitt throw a knife. It is true that while both McNutts testified that Hewitt threw a metallic object under a car in the parking lot, neither testified with certainty that the object was a knife. However, both McNutts testified that Larsen had nothing in his hands and did not throw any object, while Hewitt did throw an object that Mr. McNutt specifically said could not have been a copper weight—the only other object found in the parking lot that night. The Warden further points to Mrs. McNutt's admission that she "looked at every direction, like what was going on," when the police arrived at the scene, and argues that a reasonable juror could have inferred that Mr. McNutt was probably not paying much attention to Larsen during the commotion. But that it may have been physically possible for Larsen to throw a knife during a split second when neither of the McNutts was paying attention does not defeat Larsen's *Schlup* claim. Rather, that multiple credible witnesses saw a different person take the same actions that Larsen was accused of taking—throwing a metallic object under a nearby car—suggests that the police were mistaken about the identity of the person who threw the knife. No reasonable juror confronted with such evidence would be convinced beyond a reasonable doubt of Larsen's guilt.[7]

---

[7] The Warden also argues that the McNutts may have been biased, either against the LAPD (because of certain officers' alleged mistreatment of the McNutts at the scene) or against Hewitt (whom they testified was acting in a hostile manner toward their son). But as the Magistrate Judge found, a reasonable juror would be much more likely to conclude that a former law enforcement official and military veteran and a woman with degenerative health problems would not spend a decade consistently providing exculpatory testimony on behalf of someone with whom they lacked any meaningful personal ties, culminating with a cross-country trip to testify at the evidentiary hearing, in order to retaliate against Bunker or the LAPD for a decade-old slight.

The Warden also argues that McCracken's admission that he was previously convicted of felonies would have undermined his credibility in the eyes of the jury, especially in comparison to the police officers who testified for the prosecution. Even assuming that McCracken's convictions suggest that he is generally dishonest, the testimony of individuals who have been convicted of felony offenses is not always to be disbelieved. McCracken's testimony is to be viewed not only in light of the contradictory testimony of the police offers, but also in light of the clear testimony of the McNutts and, to a lesser extent, the declarations of Jorji Owen and William Hewitt. Moreover, the Warden does not offer any reason why McCracken would risk criminal consequences by perjuring himself for Larsen's benefit. Indeed, McCracken gave uncontradicted testimony that he was not a close friend of Larsen's.

The Warden also argues that "none of the evidence presented at the federal evidentiary hearing adequately accounts for the fact that Petitioner, when arrested at the scene, gave the police a false name." But beyond a perfunctory reference to the notion that "a truly innocent man would have had no reason to lie to police about his identity," the Warden does not explain why this false statement undermines any of the newly presented evidence of innocence adduced at the evidentiary hearing. Even if Larsen's use of a pseudonym suggests consciousness of guilt in some general sense, it cannot independently support a finding of guilt beyond a reasonable doubt for the specific crime of which Larsen was convicted. Moreover, it is undisputed that Larsen had prior convictions, and he may have had any number of reasons to try to avoid providing his true identity to the police. These might include averting arrest for a crime he did not commit.

Finally, the Warden argues that none of Larsen's new evidence undermines the trial testimony of Officers Rex and Townsend, who identified Larsen as the man who threw the knife. However, despite the Warden's repeated arguments that a "swearing match" between prosecution and defense witnesses is insufficient to satisfy *Schlup*, it never meaningfully explains how a jury faced with evidence from five different witnesses that a different person threw the knife could nonetheless have concluded that Larsen was guilty beyond a reasonable doubt. If the fact that prosecution witnesses testified against the defendant at trial were sufficient to defeat any actual innocence claim, the *Schlup* doctrine would be meaningless.

Indeed, *Schlup* itself is to the contrary. In that case, two corrections officers, Flowers and Maylee, testified that Schlup was involved in a jailhouse murder. *See Schlup*, 513 U.S. at 302 ("The State produced no physical evidence connecting Schlup to the killing, and no witness other than Flowers and Maylee testified to Schlup's involvement in the murder."). Like Larsen's, "Schlup's defense was that the State had the wrong man." *Id.* at 303. The district court had "concluded that the affidavits presented by Schlup," in which prisoners who had witnessed the crime contradicted the officers, "when considered against the positive identifications made by Flowers and Maylee, failed to constitute a sufficiently persuasive showing of actual innocence." *Id.* at 309 n.19. The Supreme Court disagreed and remanded for further proceedings, expressly holding that a "petitioner's showing of innocence is not insufficient solely because the trial record contained sufficient evidence to support the jury's verdict." *Id.* at 331. Likewise, Larsen's "post-conviction evidence casts doubt on the conviction by undercutting the reliability of the proof of guilt," even if it does not

"affirmatively prov[e] innocence"; "that can be enough to pass through the *Schlup* gateway to allow consideration of otherwise barred claims." *Sistrunk*, 292 F.3d at 673. Larsen's evidence more than suffices.

The district court already held that Larsen's conviction is constitutionally untenable because he received ineffective assistance of counsel at trial, and the Warden has not appealed that ruling. Rather, the Warden has argued only that Larsen's habeas petition should not have been considered at all because it was untimely. Because we hold otherwise, Larsen is entitled to the writ of habeas corpus entered by the district court.

## V.

When a state prisoner challenges his conviction in federal court, we must be "careful to limit the scope of federal intrusion into state criminal adjudications and to safeguard the States' interest in the integrity of their criminal and collateral proceedings." *Williams v. Taylor*, 529 U.S. 420, 436 (2000). Congress passed AEDPA, including its stringent statute-of-limitations provision, to "further [these] principles of comity, finality, and federalism." *Id.*

However, as the Supreme Court has repeatedly recognized, "in appropriate cases [these] principles of comity and finality . . . must yield to the imperative of correcting a fundamentally unjust incarceration." *Murray v. Carrier*, 477 U.S. 478, 495 (1986) (internal quotation marks omitted). This is such a case. Because we conclude that Larsen has met the demanding *Schlup* standard, we must exercise the "'equitable discretion' of habeas courts to see that federal constitutional errors do not result in the incarceration of

innocent persons." *Herrera*, 506 U.S. at 404 (quoting *McCleskey*, 499 U.S. at 502).

**AFFIRMED.**