*1108 POSNER, Circuit Judge,
concurring and dissenting.
I agree with the decision to remand this case, but not with the majority’s treatment of two critical potential witnesses for the petitioner, witnesses whom his lawyer failed to interview (or, so far as appears, failed even to attempt to interview), and by failing rendered ineffective assistance (I would prefer to say, provided inadequate professional assistance) to his client.
For a litigant to avoid being bound, as a litigant ordinarily is, by his lawyer’s mistakes, a petitioner for federal habeas corpus must establish “a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The majority opinion in the present case finds that the petitioner has presented compelling evidence that he probably would not have been convicted of murder had it not been for his trial counsel’s indefensible failure to interrogate potential alibi witnesses, and that therefore the case should be remanded to allow him to put those (and perhaps other) witnesses on the stand.
But I don’t agree with the majority’s decision to exclude from the remand a parallel inquiry into trial counsel’s failure to interview employees of a hair salon that adjoined the restaurant in front of which the murder took place. They were potential trial witnesses who have signed affidavits that if accurate provide powerful evidence of the petitioner’s innocence. The majority rejects this claim of inadequate professional assistance because Blackmon failed to raise it in the state court (in contrast, he had raised, in state post-conviction proceedings, the failure of trial counsel to interview the alibi witnesses). But such a forfeiture is excusable if “it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt” had the jury been given the evidence that the defendant’s lawyer failed through negligence to uncover. Schlup v. Delo, 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), so holds, and in House v. Bell, 547 U.S. 518, 538, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006), we read that although “the Schlup standard is demanding and permits [federal court] review only in the ‘extraordinary’ case ... [it] does not require absolute certainty about the petitioner’s guilt or innocence.... [His] burden at the gateway stage is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt.”
The hair-salon employees’ evidence might not be enough to carry the day for Blackmon given this demanding standard; nor the alibi witnesses’ evidence; but together the two bodies of evidence constitute (in combination with other factors that I’ll discuss) a powerful showing that Black-mon is innocent. The majority is willing to allow both sets of witnesses — the alibi witnesses and the hair-salon witnesses — to testify on remand, but the hair-salon witnesses only conditionally: they may testify only to the extent that their testimony is relevant to the claim that Blackmon’s lawyer rendered ineffective assistance by failing to interview the alibi witnesses. The majority concludes that Blackmon’s other ineffective-assistance claim — the claim based on trial counsel’s failure to interview the hair-salon witnesses — must be dismissed because the evidence given by the hair-salon witnesses does not establish a sufficient probability of innocence to excuse Blackmon’s forfeiture of that claim. I disagree, for reasons that I’ll explain.
*1109 Not until eight years after the murder did Blackmon obtain affidavits of the two employees of the hair salon, Latonya Thomas and Lajuan Webb, each of whom has submitted an affidavit that attests that the affiant was a witness to events surrounding the murder and that Blackmon was not one of the murderers. Though Webb did not see the shootings, immediately after hearing shots he saw two men he recognized run past the window of the salon holding guns. Neither man was Blackmon. Thomas, according to her affidavit, did see the shooting — and said she was sure that neither shooter was Black-mon.
Each of the affiants knew the shooters from the neighborhood, and “social-science studies do not suggest that people who have known one another for weeks or years are apt to err when identifying them in court.” United States v. Bartlett, 567 F.3d 901, 906 (7th Cir. 2009). Thomas’s affidavit states that after hearing what she thought were fireworks she looked through the “large plate glass window in the front of the salon,” saw the first man shoot the victim and the victim “fall to the ground in front of the business just south of the salon,” and then saw the second shooter approach the prone victim and shoot him “several more times.” She recognized this second shooter as “a man nicknamed ‘Pee’ (Real Name Unknown) who was in his late twenties.” She was “sure of the identity of the two men ... because I’ve seen them both hanging out on the street around the salon countless times.” Shown photographs of Blackmon, she said he wasn’t one of the shooters. Her statement that the second shooter was named “Pee” is consistent with early investigative leads and with Terrance Boyd’s testimony, which I discuss further below, that a man named “Pride” (Eric Bridges) was the second shooter. “Pee” (that is, the letter “P” as it is pronounced when standing alone) could well be short for “Pride.”
Lajuan Webb’s affidavit is similar. He said he heard gun shots and then saw “two guys with guns ran past the barber shop.” He’d “seen those two guys that had the guns prior to the day of the shooting in the neighborhood near the barber shop” and Blackmon “was not one of the guys I seen running past the barber shop holding a gun.” He said the police had questioned him immediately after the shooting but had never followed up.
The hair-salon witnesses are more reliable than the state’s two witnesses, who in a photo array, then in a line-up, and finally at trial, had identified Blackmon as the second shooter. Those witnesses had never met or seen the second shooter before the murder, while the hair-salon witnesses had seen both shooters before then, knew them, and were sure that neither was Blackmon. As for those witnesses’ failure to come forward with their testimony for years, Thomas explained that she “was fearful that those guys [the shooters] might have found out and tried to do something to me” had she spoken to police. Had she thought that Blackmon was one of the shooters and had been arrested, she would not have been fearful that the shooters (plural) would have tried to do something to her; she would have known that one of them had been caught and neutralized. (Webb said he hadn’t known that anyone had been arrested for the crime.)
The affidavits of the salon witnesses bolster the affidavits of the alibi witnesses on whom the majority opinion bases its decision to remand the case. The alibi witnesses claim to have seen Blackmon at a barbecue around the time of the murder and did not see him leave during that time. And all but two of them neither had nor have any close connection to him and thus would have no reason to lie to protect him. *1110 But the hair-salon witnesses likewise had and have, so far as appears, no ties to Blackmon that might cause them to lie on his behalf. (It’s not known whether either of them had any criminal history that might undermine their affidavits.)
The two eyewitnesses to the murder on whom the government rests its case had previously identified Blackmon in a photo array and then in a line-up as the second shooter. Neither recognized the second shooter as someone they’d ever met. The photo arrays postdated the murder by nearly two months and were confusing, as they contained only black-and-white photos, thus concealing hair color, skin tone, and other facial features. One of the eyewitnesses testified that she’d seen the second shooter’s face for “maybe three” seconds, the other for five seconds “maybe.” Both had been distracted. They had been in their cars at the time, both with children — five between the two of them. One, a twelve-year-old, viewed the same photo array as the two grown-ups but identified someone other than Blackmon as one of the shooters, and did not identify Black-mon as the other. Although one of the mothers had called 911 as she drove away from the murder scene, she testified that the police had not contacted her until more than a month after the shooting. One of the mothers testified that she’d told officers she’d seen an Italian or Hispanic man (Richard Arrigo, discussed in the majority opinion) holding a gun in his hand, the other that that man wasn’t holding a gun and that two black men were the shooters.
No physical evidence tied Blackmon to the murder, and the state presented no evidence of a motive — and couldn’t even explain why he’d been included in the photo array in the first place. Though one detective said the police had received information about Blackmon’s involvement in the murder “from family members,” the family members were never identified and it isn’t even clear to whose family the detective was referring. The prosecution presented no evidence that Blackmon had known either the murder victim or the man who was identified by the 12-year-old as one of the assailants and is believed on the basis of additional evidence to have been the first shooter. Although the police had heard that the shooting was the result of a dispute among gang members, no evidence of that was presented at the trial — or that Blackmon was a gang member.
Earlier I noted evidence pointing to Eric Bridges (“Pride”) as the second shooter. He belonged to the same gang as the murder victim. Neither of the state’s eyewitnesses was shown a photo of Bridges even though the police had learned four days after the murder that one of the shooters was called “Pride,” and Terrance Boyd told them before Blackmon’s trial that Bridges was the second shooter. Boyd testified that he’d met up with Tony Cox (the murder victim) on the day of the shooting because Cox had said he needed to discuss business with Bridges. Boyd said he left the two of them so that they could talk privately and walked into a nearby alley and while there he heard gunshots and “saw Eric Bridges shooting — shooting Tony” about twenty feet from where Boyd was standing. That the police didn’t show the state’s two eyewitnesses a photograph of Bridges was a remarkable investigative failure.
The case is much like Schlup. Schlup had been convicted of murdering another prison inmate. The state’s evidence consisted of testimony by two corrections officers who had witnessed the killing. Schlup’s defense included a video showing him in the prison dining room, far from where the murder took place, 65 seconds before the alarm was sounded. After the trial Schlup presented evidence that anoth *1111 er guard had seen him elsewhere in the prison right around the time of the murder, plus statements of numerous eyewitnesses to the murder who swore that Schlup had not committed it. The Supreme Court said that if the new statements were found to be reliable, “it surely cannot be said that a juror, conscientiously following the judge’s instructions requiring proof beyond a reasonable doubt, would vote to convict.” Schlup v. Delo, supra, 513 U.S. at 331, 115 S.Ct. 851.
And in Larsen v. Soto, 742 F.3d 1083, 1098-99 (9th Cir. 2013), we read that “despite the Warden’s repeated arguments that a ‘swearing match’ between prosecution and defense witnesses is insufficient to satisfy Schlup, [he] never meaningfully explains how a jury faced with evidence from five different witnesses that a different person threw the knife could nonetheless have concluded that Larsen was guilty beyond a reasonable doubt. If the fact that prosecution witnesses testified against the defendant at trial were sufficient to defeat any actual innocence claim, the Schlup doctrine would be meaningless. Indeed, Schlup itself is to the contrary.”
I agree with the statement in the majority opinion “that Blackmon’s trial counsel was constitutionally ineffective by fading to investigate the alibi witnesses and [that this] shows that the state court’s summary dismissal of the claim was unreasonable.” And I agree that a “state court’s mistake in summarily rejecting a [habeas corpus] petition, i.e., without fully evaluating conflicting evidence on disputed factual issues, does not necessarily mean the petitioner is ultimately entitled to relief.” Mosley v. Atchison, 689 F.3d 838, 842 (7th Cir. 2012) (emphasis added). So a hearing is necessary. But Blackmon’s fate should not depend entirely on the alibi witnesses. The evidence of the hair-salon witnesses is sufficiently reliable to justify a hearing about whether no reasonable juror would have convicted him had they heard those witnesses’ testimony, and such a ruling would forgive his having forfeited his claim of ineffective assistance by reason of his lawyer’s failure to interview the hair-salon witnesses before the murder trial. See Schlup v. Delo, supra, 513 U.S. at 331-32, 115 S.Ct. 851; Coleman v. Hardy, 628 F.3d 314, 318-23 (7th Cir. 2010); Wolfe v. Clarke, 691 F.3d 410, 420-22 (4th Cir. 2012).
Ineffective assistance of counsel in regard to the potential hair-salon witnesses, forfeited because not urged by counsel in the state court proceedings, is a constitutional error that can support a petition for habeas corpus. The failure of Blackmon’s trial counsel to locate and interview the two employees of the salon who had seen the murderers, recognized them, and were sure that Blackmon was not one of them, was a disastrous blunder given the paucity of evidence of his guilt. Counsel must have accepted the police reports (which stated that one person at the salon had been interviewed and had not seen the murder) uncritically; for he failed to conduct his own investigation to discover whether anyone else had been in the salon. Although Blackmon’s new evidence should be subject to scrutiny on remand, he has made a strong showing that his lawyer’s failure to find and interview the hair-salon witnesses fell below the minimum standard of reasonable representation _ of a defendant charged with murder and greatly harmed Blackmon’s defense. Cf. Campbell v. Reardon, 780 F.3d 752, 767-72 (7th Cir. 2015); Mosley v. Atchison, supra, 689 F.3d at 848-49; U.S. ex rel. Hampton v. Leibach, 347 F.3d 219, 249-56 (7th Cir. 2003); Washington v. Smith, 219 F.3d 620, 629-32 (7th Cir. 2000).
The Schlup standard “does not require absolute certainty about the petitioner’s *1112 guilt or innocence.” House v. Bell, supra, 547 U.S. at 538, 126 S.Ct. 2064. Yet the evidence emanating from the ham-salon witnesses comes close. They knew the shooters and say with certainty that neither one was Blackmon' — -instead the second one probably was Eric “Pride” Bridges. The two hair-salon witnesses have no known connection — family, business, social, political — to Blackmon and thus nothing to gain from lying to protect him. Compare Smith v. McKee, 598 F.3d 374, 388 (7th Cir. 2010); Hayes v. Battaglia, 403 F.3d 935, 938 (7th Cir. 2005).
The hair-salon witnesses’ affidavits, in combination with the other evidence of Blackmon’s evidence that I’ve just summarized, would seem to outweigh the identification of him as one of the shooters, months after the shootings, by two unreliable eyewitnesses. Against this the majority opinion argues that “even if the risk that any one identification would be mistaken is substantial, the risk that multiple witnesses would make the same error is smaller.” Were this true (as I doubt, because a witness may be influenced by a forceful, confident, yet thoroughly erroneous report by another witness of the same event), it still would do nothing to bolster the majority’s belief that the government’s eyewitnesses were more reliable than the hair-salon witnesses. For there were two of them also — making them multiple witnesses, too, and the multiple was identical to that of the government’s witnesses. The majority opinion thus does nothing to enable us to distinguish the accuracy of the government’s eyewitnesses from that of the hair-salon witnesses — yet for reasons explained earlier in this opinion the latter witnesses seem more credible than the former.
The majority opinion points out that the hair-salon witnesses did “not come forward until eight years after the murder, a substantial delay that could affect their memories and/or their credibility.” Could; but I imagine that witnessing a murder is the kind of experience that sticks with one for many years, especially when one recognizes the murderers.
In sum, the hair-salon witnesses’ evidence by itself, without regard to the alibi witnesses’ evidence, if found reliable would entitle Blackmon to a new trial. And a remand to determine that reliability is essential, lest the alibi witnesses prove to be unconvincing on remand.
On this note I end my discussion of Blackmon’s appeal with a plea to the majority to reconsider its brush off of the hair-salon witnesses. But I want in closing to mention some reservations that I have concerning terminology in the majority opinion. I do not criticize the majority for the terminology. It is taken from previous decisions, many of them Supreme Court decisions; it is not the invention of this panel. But legal language is a plague, much of which originates in Supreme Court opinions.
An example of what troubles me is the majority opinion’s numerous iterations of the phrase “actual innocence,” and its occasional invocations of the cognate term “actually innocent.” These phrases are misleading. A defendant is either innocent or guilty. There is no separate state of being actually rather than just — just what? — innocent. So what work is “actual” or “actually” doing? None I think. Something in the legal genome causes lawyers and judges to want to speak in pairs, as in “arbitrary and capricious” and “clear and convincing.” Ask yourself: what does “arbitrary” add to “capricious” or vice versa, “clear” to “convincing” or vice versa, “actual” to “innocence.”
The history of the term “actual innocence” is revealing. Its remote origin is a famous article by Judge Henry Friendly, *1113 “Is Innocence Irrelevant? Collateral Attack on Criminal Judgments,” 38 17. Chi. L. Rev. 142 (1970). He argued that for collateral attacks (as by federal habeas corpus) on criminal convictions — attacks based for example on alleged federal constitutional violations in the state proceeding — to succeed on a procedurally barred claim, generally the petitioner should be required to present evidence that he probably was innocent of the crime for which he had been convicted. Three justices of the Supreme Court adopted Judge Friendly’s suggestion in Kuhlmann v. Wilson, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986), where Justice Powell, writing for the plurality, added “factual” before “innocence.” The Court adopted this formulation, minus the “f,” to create the “actual innocence” exception to procedural default at issue in this case. See Murray v. Carrier, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). The term is understood to distinguish not having committed the crime of which one was charged from having been entitled to acquittal on some ground unrelated to the merits, such as lack of jurisdiction. See Bousley v. United States, 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998) (“‘actual innocence’ means factual innocence, not mere legal insufficiency”). It would have been more accurate to say that some acquittals are based on the defendant’s having been found innocent of the crime or crimes with which he was charged, and others are based on reasons unrelated to guilt or innocence, such as lack of jurisdiction, violation of certain constitutional rights (for example, rights conferred by the Fourth Amendment), or expiration of the statute of limitations. Fair enough, but the adjectives “factual” and “actual” add nothing to the distinction. The Court should have stuck with “innocence,” dropping both adjectives.
Another familiar term in legal discourse that appears in the majority opinion in this case and that I would like to see purged is “procedural default,” a cumbersome alternative to “forfeiture.” The failure of a petitioner for federal habeas corpus to have given the state courts a chance to rule on the claim he seeks to vindicate in the habeas corpus proceeding normally forfeits the right to press the claim in federal court. But the petitioner can be relieved of his forfeiture — as he should be in this case with regard to the hair-salon witnesses irrespective of the fate of the alibi witnesses — if he has strong though not necessarily conclusive evidence of his innocence.